United States District Court
Southern District of Texas
**ENTERED**
October 01, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAUL OBANUA and GETGO CHARTER, INC., | § § § § | |
| Plaintiffs, | § § | |
| v. | § § § | Civil Action No. 4:22-CV-03401 |
| DONNA P. CAMPAGNOLO, DIRECTOR, USCIS CALIFORNIA SERVICE CENTER; UR M. JADDOU, DIRECTOR, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, | § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Federal law limits who can reside in the United States on a temporary or permanent basis. This case involves one of these limits. Plaintiff Paul Obanua is a Nigerian citizen who became the Chief Executive Officer and President of Plaintiff GetGo Charter, Inc., in 2019. GetGo Charter is a company in Houston, Texas, that rents vehicles to drivers who work for rideshare companies like Uber, Lyft, DoorDash, Instacart, and others. Even though Obanua is a citizen of Nigeria, he has been working in the United States on a visa. Because Obanua's visa status was about to expire, GetGo Charter filed a petition to extend his status, but the United States Citizenship and Immigration Services ("USCIS") denied it. GetGo Charter and Obanua sued the agency, challenging its denial as arbitrary and capricious under the Administrative Procedure Act ("APA").

Pending before the Court is Plaintiffs' Amended Motion for Summary Judgment, (Dkt. No. 9), and Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 10). For the following reasons, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, (Dkt. No. 9), and **GRANTS** Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 10).

## I.  BACKGROUND

### A.  LEGAL BACKGROUND

Before turning to the facts, the Court lays out the legal framework to provide context. That framework begins with the Immigration and Nationality Act ("INA"). The INA provides several ways for certain classes of nonimmigrants to live and work in the United States temporarily. *See* 8 U.S.C. § 1101(a)(15). The L-1 visa is one way. The L-1 visa comes in two varieties: L-1A and L-1B. Relevant here, the L-1A visa allows a multinational organization to transfer a foreign employee to its operations in the United States when the employee will be working for the U.S. based operation in a managerial or executive capacity. *See* 8 U.S.C. § 1101(a)(15)(L).[1]

The INA defines both "managerial capacity" and "executive capacity." 8 U.S.C. § 1101(a)(44)(A)–(B). The term "managerial capacity" means an employee who "primarily"

> (i) manages the organization, or a department, subdivision, function, or component of the organization;

---

[1]   An employee's authorized stay in the United States is limited to seven years. 8 U.S.C. § 1184(c)(2)(D)(i).

> (ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;
>
> (iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and
>
> (iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

8 U.S.C. § 1101(a)(44)(A)(i)–(iv). "Managerial capacity" does *not* include a "first-line supervisor"—someone who oversees and manages the day-to-day activities of front-line employees within the organization. 8 U.S.C. § 1101(a)(44)(A). The only exception is when the supervised employees qualify as "professional." *Id.*

Next, the INA defines "executive capacity" as an employee who "primarily"

> (i) directs the management of the organization or a major component or function of the organization;
>
> (ii) establishes the goals and policies of the organization, component, or function;
>
> (iii) exercises wide latitude in discretionary decision-making; and
>
> (iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

8 U.S.C. § 1101(a)(44)(B)(i)–(iv).

Regardless of whether a visa applicant seeks to establish managerial or executive capacity, "[a]n individual shall not be considered to be acting in a managerial or executive

3

capacity . . . merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed." 8 U.S.C. § 1101(a)(44)(C). But if the USCIS uses staffing levels as a factor in determining whether an individual is acting in a managerial or executive capacity, "the Attorney General shall take into account the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function." *Id.*

Also, to extend their L-1A status, petitioners may file a new petition with more evidence. 8 C.F.R. § 214.2(l)(14)(ii). This evidence includes:

> (A) Evidence that the United States and foreign entities are still qualifying organizations . . . ;
>
> (B) Evidence that the United States entity has been doing business . . . for the previous year;
>
> (C) A statement of the duties performed by the beneficiary for the previous year and the duties the beneficiary will perform under the extended petition;
>
> (D) A statement describing the staffing of the new operation, including the number of employees and types of positions held accompanied by evidence of wages paid to employees when the beneficiary will be employed in a managerial or executive capacity; and
>
> (E) Evidence of the financial status of the United States operation.

*Id.*

**B.    FACTUAL BACKGROUND**[2]

With this framework in place, the Court turns to the facts. Obanua is a Nigerian citizen. (Dkt. No. 10 at 8). In 2019, Obanua became the CEO of Plaintiff GetGo Charter, Inc. ("GetGo Charter"), (*id.*), a company in Houston, Texas, that was incorporated that same year, (Dkt. No. 8-1 at 70); (Dkt. No. 8-2 at 2–12). GetGo Charter rents vehicles to rideshare and delivery drivers who work for rideshare companies like Uber, Lyft, DoorDash, and Instacart. (Dkt. No. 9 at 5). It is an American affiliate of Green Field Assets Ltd., a Nigerian investment and development company. (*Id.* at 12). Obanua owns 100% of GetGo Charter and 99% of Green Field Assets. (*Id.*); (*see also* Dkt. No. 8-2 at 105).

GetGo Charter only has two employees—Obanua and the Director of Operations. (Dkt. No. 8-1 at 18). As CEO, Obanua is generally responsible for entering into contracts with third-party companies and vendors that keep the business running. (Dkt. No. 1 at 8); (*see also* Dkt. No. 9 at 14–15, 19). For instance, GetGo Charter uses the following companies:

- Pentoz to develop GetGo Charter's mobile app;
- Passtime for Automotive GPS Tracking and Telematics;
- V12 to maintain its CRM database for customer data;
- iHeartMedia for promotions in lieu of an advertising department;
- Panthera Advisers to prepare GetGo Charter's financial projections, valuation, and capital strategy;

---

[2]   Except where noted, this section contains only undisputed facts, and all facts and reasonable inferences have been construed in favor of the nonmovant. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). The Court has not weighed evidence or made credibility findings. *Id.*

- Slidebean Inc. to provide design services for GetGo Charter's sales pitch deck; and

- Tire & Wheel Source to maintain and repair GetGo Charter's cars.

(Dkt. No. 9 at 19); (*see also* Dkt. No. 8-4 at 74–116, 118–30, 132–36, 138–49); (Dkt. No. 8-5 at 2–27, 74–81, 83–89).

On October 2, 2019, GetGo Charter petitioned the USCIS for an L-1A visa for Obanua to serve as the CEO and President of the company. (Dkt. No. 8-1 at 70). In November 2020, the USCIS approved the petition and granted Obanua L-1A visa status for one year. (Dkt. No. 9 at 12); (Dkt. No. 10 at 8–9.). On February 26, 2021, GetGo Charter filed a second L-1A petition, (Dkt. No. 10 at 9), which the USCIS approved on March 10, 2021, (*id.*); (Dkt. No. 9 at 12); (Dkt. No. 1 at 7).

Obanua's L-1A status expired on November 3, 2021, (Dkt. No. 8-6 at 3), so GetGo Charter filed a third petition—the petition at issue—to extend his status, (Dkt. No. 8-1 at 63–64); (Dkt. No. 8-2 at 102–111). In this third petition, GetGo Charter alleged that Obanua would continue to act in an "Executive Capacity" as defined under the INA. (Dkt. No. 8-2 at 103).

After reviewing the petition, the USCIS determined that GetGo Charter had not proven that Obanua would primarily perform executive duties for the company, even though it believed that Obanua "exercise[d] discretion over [GetGo Charter's] day-to-day operations and possesse[d] the requisite level of authority with respect to discretionary decision-making." (Dkt. No. 8-1 at 23). Thus, on January 28, 2022, the USCIS notified GetGo and Obanua that it needed more evidence. (*Id.* at 20–33).

6

GetGo Charter responded on June 6, 2022, with additional documents. (*Id.* at 7, 16, 49–58). In the response, GetGo Charter mainly focused on the first and fourth elements of the "executive capacity" test because it believed the USCIS conceded that Obanua met the other requirements. (*Id.* at 50).

On June 9, 2022, the USCIS denied the third petition for several reasons. (*Id.* at 2–19). First, the USCIS noted that GetGo Charter did not provide "sufficient details regarding what actual activities or duties [Obanua] performs related to" various activities, such as "'managing the capital raise campaign.'" (*Id.* at 7, 16). Second, the USCIS believed that Obanua primarily performed operational and administrative tasks and that he would not be relieved of the need to perform those tasks by subordinates. (*See id.* at 7–8, 16–17). And third, the USCIS found GetGo Charter's staffing and organizational structure insufficient to establish Obanua's executive status. (*Id.* at 8–9, 17–18).

GetGo Charter and Obanua filed a complaint against Defendant Donna P. Campagnolo, Director of USCIS California Service Center, and Defendant Ur M. Jaddou, Director of USCIS, challenging the denial as arbitrary and capricious under the APA. (Dkt. No. 1 at 3, 10–13). GetGo Charter and Obanua subsequently moved for summary judgment. (Dkt. No. 4). Later, Defendants filed the certified administrative record under seal. (Dkt. No. 8). GetGo Charter and Obanua filed an amended summary judgment motion, (Dkt. No. 9), and Defendants cross-moved for summary judgment and opposed GetGo and Obanua's summary judgment motion, (Dkt. No. 10).

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the suit's outcome under governing law. *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). And "[a] dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *TIG Ins. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the record evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c); *see also Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must "'go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

8

designate specific facts showing that there is a genuine issue for trial.'" *Nola Spice Designs, LLC v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553). "The nonmovant must 'identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim.'" *Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (per curiam) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)), *as revised* (July 14, 2017). If evidence is merely colorable or not significantly probative, summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511).

In reviewing a motion for summary judgment, the district court views the evidence in the light most favorable to the nonmovant. *Carr*, 866 F.3d at 601. This means that courts must resolve factual controversies in the nonmovant's favor, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075.

And when parties cross-move for summary judgment, as in this case, courts review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *Amerisure Ins. v. Navigators Ins.*, 611 F.3d 299, 304 (5th Cir. 2010).

    **B.**    **REVIEW OF AGENCY DETERMINATIONS**

"It is well settled that the applicant for a visa bears the burden of establishing eligibility." *Nat'l Hand Tool Corp. v. Pasquarell*, 889 F.2d 1472, 1475 (5th Cir. 1989). "The denial of a visa application is an agency action which stands unless it was 'arbitrary,

9

capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" *Yogi Metals Grp., Inc. v. Garland*, 38 F.4th 455, 458 (5th Cir. 2022) (per curiam) (brackets in original) (quoting 5 U.S.C. § 706(2)(A)). Generally, an agency action is arbitrary and capricious if the agency: (1) "relied on factors which Congress has not intended it to consider"; (2) "entirely failed to consider an important aspect of the problem"; (3) "offered an explanation for its decision that runs counter to the evidence before the agency"; or (4) provided an explanation that was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

"The scope of review under the 'arbitrary and capricious' standard is narrow, and a court is not to substitute its judgment for that of the agency." *Id.* at 43, 103 S.Ct. at 2866. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962)).

In reviewing the agency's explanation, courts "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 43, 103 S.Ct. at 2866–67 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). Also, "[i]n reviewing a challenge to the agency's decision, 'the focal point for judicial review should be the administrative record already in existence, not some new record

10

made initially in the reviewing court.'"  *Grinin v. Johnson*, 224 F.Supp.3d 525, 530 (S.D. Tex. 2016) (quoting *Luminant Generation Co. v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013); *see also Yogi Metals Grp. Inc. v. Garland*, 567 F.Supp.3d 793, 798 (S.D. Tex. 2021) ("Review in the district court is then limited to the administrative record."), *aff'd*, 38 F.4th 455 (5th Cir. 2022).  "The agency decision need only have a rational basis, and it does not have to be a decision which the court would have made."  *Wilson v. U.S. Dep't of Agric.*, 991 F.2d 1211, 1215 (5th Cir. 1993).

### III.   DISCUSSION

GetGo Charter and Obanua argue that USCIS's denial of the third petition is arbitrary and capricious for various reasons.  They challenge USCIS's contention that GetGo Charter did not provide enough detail about and evidence of Obanua's roles and duties, (*see* Dkt. No. 9 at 21); (Dkt. No. 11 at 7), and they primarily object to USCIS's distinction between supervising an independent contractor and an employee as arbitrary and capricious, (Dkt. No. 9 at 17–20).  According to GetGo Charter, "[t]his is what real business looks like in the digital age."  (*Id.* at 19).  They thus claim that it makes no difference whether the duties of the manager include managing a subordinate under his authority, or whether "an executive at the contractor company also has a stake in seeing the job through," because Obanua "still dictates the terms by which the work will be done and is responsible for assessing whether it has been done."  (Dkt. No. 11 at 6).  Thus, according to GetGo Charter and Obanua, "USCIS's theory of denial rests on an anachronistic understanding of hierarchical business models which is not required by the

11

regulations." (Dkt. No. 9 at 17). Finally, they argue that USCIS's lack of deference to the prior determinations was arbitrary and capricious. (*Id.* at 22–23).

The Court disagrees. First, the record supports the USCIS's determination that GetGo Charter did not provide enough detail about what Obanua does each day, (Dkt. No. 8-1 at 7, 16), and did not "convey meaningful information regarding what specific activities particular to the U.S. entity will occupy [Obanua's] time in the U.S. position," (*id.* at 6, 15). When GetGo Charter discussed the allocation of Obanua's duties in response to USCIS's request for evidence, the USCIS could not determine why GetGo Charter detailed duties that involved the same activities yet listed them as distinct duties. (*Id.* at 6–7, 15–16). And while GetGo Charter responded by stating that Obanua "primarily spends his time managing the capital raise campaign with the crowdfunding platform" the company uses, (*id.* at 51, 7, 16), GetGo Charter "did not provide sufficient details regarding what actual activities or duties [Obanua] performs related to 'managing the capital raise campaign,'" (*id.* at 7, 16).

The record further reveals that Obanua only manages and oversees outside companies, not any entities or employees within GetGo Charter. (*See* Dkt. No. 9 at 14–15). Indeed, GetGo Charter's own petition shows that Obanua primarily "manages" GetGo Charter by contracting with outside companies to perform the required tasks, including (1) software development companies in California to develop the GetGo application that allows the drivers to rent vehicles and renew rental agreements through their mobile phones; (2) a company to develop and install tracking machines on its automobiles so that GetGo can manage its fleet of vehicles; and (3) consultants, designers,

12

and marketing specialists to manage GetGo's capital-raise efforts with crowdfunding and start-up incubators. (Dkt. No. 8-2 at 106); (Dkt. No. 8-1 at 6, 15). The record further emphasizes Obanua's role in "locating third party service providers, contracting with those providers, and working directly with the providers to provide services" to the company. (Dkt. No. 8-1 at 7–8, 16–17).

GetGo Charter and Obanua insist that working with outside companies is primarily executive in nature and that any distinction between supervising an independent contractor and an employee is arbitrary and capricious. (*See* Dkt. No. 9 at 17–21). But they fail to provide evidence showing that Obanua's role in working with independent contractors is more than a collaborative client relationship, and they cite no binding case law supporting their contention. Instead, they primarily rely on nonbinding agency decisions. (*See id.* at 19–20) (relying on *In re Irish Dairy Bd., Ltd.*, File No. A28-845-421 (AAU Nov. 16, 1989) and *In re Z-A-*, Adopted Decision 2016-02 (AAO Apr. 14, 2016)).

Therefore, it was not arbitrary and capricious for the USCIS to determine that Obanua only performed "nonqualifying administrative or operational tasks necessary to the provision of a service or the production of a product." (Dkt. No. 8-1 at 8, 17). This is especially true given that Obanua's weekly activities were limited to "operational and administrative activities," such as "meeting with digital marketing agency," "networking meet-up," and "customer relationship building." (*Id.* at 7, 16). Accordingly, USCIS was not unreasonable in viewing Obanua as a point of contact with third-party companies rather than an executive under the INA.

In addition, the USCIS acted neither arbitrarily nor capriciously in determining that Obanua's duties *within* GetGo Charter were not primarily executive or managerial. True, Obanua allegedly directed the management of various departments and personnel—such as the Technology Department, Logistics and Procurement Department, Sales and Marketing Department, the Sales and Marketing Manager, the Managing Director, the Chief Financial Officer, and the Finance and Accounting Manager. (*Id.* at 8, 17). But none of these departments or personnel existed when the petition was filed. (*Id.*). The USCIS reasonably thought, therefore, that GetGo Charter could not "claim that [Obanua] would spend his time directing managerial staff that did not yet exist when the petition was filed." (*Id.*). The USCIS thus did not act arbitrarily and capriciously in denying the third petition because Obanua would not "be relieved of the need to perform [the] administrative tasks by subordinates." (*Id.*).

Similarly, the USCIS did not act arbitrarily or capriciously in denying the petition based on GetGo Charter's staffing and organizational structure. GetGo Charter allegedly employed three individuals: (1) a Director of Operations and Customer Experience; (2) an Accountant; and (3) a Customer Service Associate. (*Id.*). As to the first employee, there is no evidence of company payments to him, nor is there evidence that his position was in a supervisory, managerial, or professional capacity—especially since most of the process was automated and required him to prepare customer feedback reports for Obanua. (*See id.* at 8–9, 17–18). As for the accountant, GetGo Charter failed to establish that he was actually an employee when he worked only six hours every quarter, received $1,200 annually for his work, and did not provide continuous services to the company.

14

(*Id.* at 9, 18). Finally, as to the customer services associate, the USCIS could not consider him an employee because he was hired five months after the petition was filed and, accordingly, was outside the relevant time frame for establishing eligibility. (*Id.*).

As a result, the USCIS had reason to doubt GetGo Charter's portrayal of Obanua as a high-level executive who "receive[s] only general supervision or direction from the board of directors." (*Id.* at 50). After all, the record establishes that GetGo Charter had two full-time employees at the time of the application—Obanua and the Director of Operations. (*Id.* at 9, 18). GetGo Charter thus lacks the organizational complexity required to establish Obanua as an executive. "At best, [Obanua] is a first-line supervisor of a non-professional employee." (*Id.*). It was neither arbitrary nor capricious for the USCIS to conclude that GetGo Charter "does not have sufficient staffing in place to relieve [Obanua] from primarily performing operational and administrative tasks" and, therefore, would not employ Obanua "in a predominantly managerial or executive position." (*Id.*).

Finally, GetGo Charter argues that USCIS's lack of deference to the prior determinations was arbitrary and capricious. (Dkt. No. 9 at 22–23). USCIS responds that the deference policy does not apply to new office petitions because the relevant regulations contain strict and unique evidentiary requirements for eligibility. (Dkt. No. 10 at 18); (*see also* Dkt. No. 8-1 at 8, 17) (noting that "the regulations provide strict evidentiary requirements for the extension of a 'new office' petition"). The USCIS reasonably gave greater weight to the federal regulations governing its decisions than its

internal policy. Accordingly, the USCIS did not act arbitrarily or capriciously in not deferring to previous determinations.

## IV.   CONCLUSION

In light of the above, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, (Dkt. No. 9), and **GRANTS** Defendants' Cross-Motion for Summary Judgment, (Dkt. No. 10).

It is SO ORDERED.

Signed on September 30, 2024.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**